General Green became bound by bond, (in 1783,) as security for Banks & Co. to Harris and Blachford, in 18,473. Afterwards Banks & Co. gave XL and B. sundry orders on different persons, and assigned them bonds and notes, and II. & B. gave receipt for the papers so delivered them. Among other securities which Banks , . , , ,, _ , & Co. liad assigned to H. & B. were bonds of McQueen ^ ^'ai'nes' Some time in November or December 1783, Penman informed Harris that he held a mortgage of the negroes sold by Banks to M‘Queen & Carnes, whose bonds to Banks were for those negroes which he sold them *431 subsequent to tlie mortgage; which bonds of M‘Queen & Carnes were those assigned to H. & B. as collateral seen-i'ity for the debt in which general Green was security. In July 1784 sundi’y communications were had with general Green, in which Harris informed him of the state of the mortgage of negroes to Penman. In August and September 1784, further communications took place between general Green and H. & B. in which they offer to take the further risk of every thing except M> Queen’s and Carnes’s bond, and ask security for that. General Green refused further security,-but proposed to settle with Penman for his mortgage, and to remove M‘Queen’s and Carnes’s objections to paying their bonds. The assignment by Banks of MeQueen’s and Carnes’s bonds was in December, 1783. It was contended for complainant, that the mortgage to Penman being on record prior to Harris & Blachford taking the bonds of M>Queen and Carnes, (the principal matter in dispute,) H. & B. 'were bound to take notice of it. That there not doing so was a laches which the court Will not relieve against. That besides, as they were positively apprised of the mortgage, by notice from Penman, at least six months prior to giving general G. notice, such negligence would subject them to the loss; for if general G. had received immediate notice, he*might have procured some other security-from Banks. That H. & B. having taken the bonds of McQueen and Carnes, payable at the distant period of two years after the money ought to have been paid by Banks, the principal in the original bond, (to which general G. was security,) without the consent of general G. was changing the original contract, and would release the securities. That after knowing of the mortgage to Penman, (which weakened or destroyed the security of bP Queen and Carnes’ bond,) they made a re-assignment to Banks, of debts he had assigned to them, instead of which they should have taken a further assignment of Banks and Carnes’ hooks. That the receipt of H. &B. was evidence of their accepting the assigned bonds and notes as actual and not as a conditional payment,Tor the receipt says “ Received contents in bonds and notes,” from which the inference is, they *432 had received satisfactory bonds and notes, agreeably to the tenor of the order, and this is corroborated By letter of XI. & B. acknowledging payment from Forsyth & Co. to the amount of the order. — The cases of Skip vs. Huey, 3 Atk. 91, and Nesbit vs. Smith, 2 Bro. 579, were quoted.
*431 MARCH, 1795.
Decree,
jj. wag contendcd by defendants, that from Harris &, Blackford having demanded security from general Green on failure of M4 Queen and Carnes’ bonds, it is evident he did not consider general G. discharged. That they always designated the papers received as collateral papers, and additional securities. That taking them wás not obligatory, but a favor conferred on the debtors. That the ■receipt refers to an account, by which it appears these papei’s taken were to be considered a payment, or a satisfaction when paid. Th at general Green’s letter, so late as September 1784, considers them as collateral security. That the taking M4Queen’s and Carnes’ bonds, being without the consent of general G. was of no importance. It could not hurt, hut might benefit him. That the reassignment of some of the collateral securities was to get hotter paper; and there is no memorandum or receipt to shew the papers, were taken as payment. The case of Shubrick vs. executors of Livingston was quoted.
The court said, that the whole evidence is to be taken together to explain the tendency of the receipt of II. & IL for the papers. The reference made by the, receipt to the account, and what appears bn the.face of that, shews it was not the intention of the parties, that the assigned papers should he considered as actual payment. All the subsequent letters and communications shew the same, The circumstances indicate that Penman’s notice to H. & B. of his having a mortgage from Banks [of the negroes which he had afterwards sold to M4Qucen and Carnes, and taken their bonds, which he assigned to H. & B.] was subsequent to H. & B. having taken an assignment of them. The re-assignment of part'of the‘assigned papers was evidently to procure better paper, and the new paper so procured is expressed to be as additional security. Had II. & B. been treating for the purchase of the negroes, they would have been bound to fake notice- of *433 the prior mortgage of Penman on record; but they were accepting as a collateral security bonds, which on their face did not relate to any other matter, and no incident then occurred to give them any suspicion that the bonds had any connexion with the mortgage. H. & 13. may be blameable for not giving general G. earlier notice of the failure of M‘Qucen and Carnes’ bonds — But not in such degree as to subject them to the loss of their debt. It was so determined in the case of Shubriclc vs. executors of Livingston. Skip and Huey is not applicable here. There is no fraud chargeable on H. & B. nor imputed to them. It never was the intention to release general G. It has been established by a judgment at law, and he must remain bound.
E. Rutledge for complainant, Ward and Pringle for Harris & Blackford, Dcsaussnrc and Ford for Warring-* ton.
Injunction dissolved; and bill dismissed with costs.